UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MORRIS COTTON,

        Plaintiff,

v.

BEAUMONT HEALTH, BEAUMONT
HEALTH SYSTEMS, OAKWOOD
HEALTHCARE SYSTEM, KELLY
SMITH, and SHERRY HUFFMAN,

        Defendants.

_____/

Case No. 16-12232

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [18]**

Plaintiff Morris Cotton commenced this employment discrimination suit in this Court

on June 16, 2016, asserting claims of race and age discrimination, retaliation, and hostile

work environment against his employer, Defendant Beaumont Health ("Beaumont"),[1] and

two individual executives employed by Beaumont, Defendants Kelly Smith and Sherry

Huffman.  In support of these claims, Plaintiff alleges that he was denied two promotions

on account of his race or age, and that Defendants retaliated against him and created a

hostile work environment after he filed a charge with the U.S. Equal Employment

Opportunity Commission ("EEOC") complaining of race and age discrimination.  This

Court's jurisdiction rests upon Plaintiff's assertion of claims under Title VII of the Civil Rights

_____

[1]In September of 2014, Defendants Beaumont Health Systems and Oakwood
Healthcare System (along with non-party Botsford Hospital) affiliated under the joint
name Beaumont Health.  The Court will refer to these defendants collectively as
"Beaumont" in the remainder of this opinion and order, except as necessary to address
events involving only one of these entities.

Act of 1964, 42 U.S.C. § 2000e *et seq.,* and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq. See* 28 U.S.C. § 1331.

Through the present motion filed on April 28, 2017, Defendants now seek an award of summary judgment in their favor as to each of the claims asserted in Plaintiff's complaint. In support of this motion, Defendants first contend that Plaintiff's claims of race and age discrimination were not timely brought within the 300-day period of limitation governing these claims. Alternatively, Defendants maintain (i) that Plaintiff cannot establish a *prima facie* case of race or age discrimination, and (ii) that the evidence produced by Plaintiff is insufficient as a matter of law to show that Defendants' stated reasons for denying Plaintiff the promotions at issue were a pretext for unlawful discrimination on account of Plaintiff's race or age. As for Plaintiff's claims of retaliation, Defendants argue (i) that the individual Defendants are not subject to liability under Title VII or the ADEA for any allegedly retaliatory conduct, (ii) that Plaintiff did not exhaust his administrative remedies with respect to his claims of retaliation, and (iii) that Plaintiff has failed to establish one or more of the elements of a *prima facie* case of retaliation.

Defendants' motion has been fully briefed by the parties, and on August 16, 2017, the Court heard oral argument on this motion. For the reasons stated more fully below, the Court GRANTS Defendants' motion in its entirety.

## I.    FACTS

In July of 2007, at the age of 49, Plaintiff Morris Cotton began his employment with Defendant Beaumont, working as the Director of Security at the Oakwood Hospital and Medical Center in Dearborn, Michigan ("Oakwood Dearborn"). Plaintiff has a bachelor's degree in criminal justice and a master's degree in liberal studies, with a concentration in

technology, and he is board certified in homeland security and as a law enforcement administrator. Prior to his employment with Beaumont, Plaintiff worked as a security director at St. John's Hospital, a patrol officer at the Oakland County Sheriff's Department, and a law enforcement officer for the Highland Park Police Department, where he achieved the rank of lieutenant over a 25-year career.

The parties agree that Plaintiff performed well as Oakwood Dearborn's Director of Security. He was chosen to attend leadership academies, and he received positive yearly performance appraisals. Throughout his career as a Beaumont employee, Plaintiff has received numerous awards and has been recognized for a number of achievements.

## A. Plaintiff's Application for the Position of Administrator, Support Operations

The first instance of alleged discrimination identified in Plaintiff's complaint arose from his application in July of 2013 for the newly created position of Administrator, Support Operations. As stated in the job description for this position, the Administrator, Support Operations was expected to "oversee daily operational functions throughout" Oakwood Dearborn, including the activities of eight departments at the facility. (Defendants' Motion, Ex. 2, Job Description for Administrator, Support Operations.)

Plaintiff was one of 63 individuals who applied for this position. He and twelve other applicants were "strongly considered" for the position, and he and four external candidates were interviewed. (Defendants' Motion, Ex. 3, Huffman Decl. at ¶¶ 4-5.) Following these interviews, James Benko (an Asian male, age 41) and Patricia Adams (an African-American female, age unknown) were selected as the final two candidates, and the position was offered to Mr. Benko. Although Mr. Benko accepted the position, Beaumont rescinded its offer when he failed to pass the required background check. Beaumont then contacted

Ms. Adams to determine whether she was still interested in the position, but she informed Beaumont that she had accepted another position.

According to Defendant Sherry Huffman, the vice president of human resources at Oakwood Dearborn, Beaumont's interview panel determined that none of the remaining candidates (including Plaintiff) was "sufficiently qualified for the position," so the posting for the position of Administrator, Support Operations was cancelled. (*Id.* at ¶ 12.) By letter dated October 7, 2013, Plaintiff was informed of this cancelled job posting. (*See* Defendants' Motion, Ex. 13, 10/7/2013 Letter.)

## B. Plaintiff's Application for the Position of Director, Support Operations

The next instance of alleged discrimination identified in Plaintiff's complaint concerns his July 2014 application for the newly created position of Director, Support Operations. According to Ms. Huffman, this position was "more tailored to [Plaintiff's] background," because it entailed overseeing the daily functioning of five departments, rather than eight, and because three of these five departments were supervised by outside contractors, so that Plaintiff's "lack of experience in those areas was not a hindrance to his selection for this position." (Huffman Decl. at ¶¶ 14-17.)

Oakwood Dearborn received 37 applications for the position of Director, Support Operations, and Plaintiff and three other applicants were considered. Plaintiff was selected for the position and offered an annual salary of $109,200, reflecting an eight percent increase over his current salary. (*See id.* at ¶ 21.) In response, Plaintiff requested a salary increase of between $30,000 and $35,000, as well as eligibility for bonuses. (*Id.*; *see also* Defendants' Motion, Ex. 1, Plaintiff's Dep. at 73-74, 84.) In Defendants' view, however, Plaintiff's salary and bonus demands were more consistent with an administrator-level

position than the position of director, and Oakwood Dearborn therefore declined to meet these demands. (*See* Huffman Decl. at ¶ 21.)  In addition, Plaintiff was informed that as Director, Support Operations, he would still have to perform all of his existing duties as Director of Security, and that he would not be allowed to hire someone to fill his existing position. (*See* Plaintiff's Dep. at 84.)  In light of what he was told, Plaintiff turned down the offer, and the position of Director, Support Operations was cancelled. (*Id.*; *see also* Huffman Decl. at ¶¶ 22-23.)

## C. Beaumont's Expansion of Its Contract with Non-Party Crothall Facilities Management

In 2003, Defendant Oakwood Healthcare entered into an agreement with non-party Crothall Facilities Management, Inc. ("Crothall") to provide plant operations and maintenance services at Oakwood's facilities.  This contract was amended over the years to expand Crothall's role, including an amendment in February of 2015 after Defendant Oakwood joined with Defendant Beaumont Health Systems and other health care institutions to form Defendant Beaumont Health.  In connection with this contract amendment, Chris Soop was promoted to the position of General Manager for Crothall, and he was assigned the responsibilities of "oversee[ing] the daily operations and strategic planning" for six departments at Oakwood Dearborn, including Security.  (Defendants' Motion, Ex. 18, 2/11/2015 Smith Memo; *see also* Defendants' Motion, Ex. 17, Soop Decl. at ¶¶ 6-7.)  According to Plaintiff's complaint, the General Manager position held by Mr. Soop following his promotion encompassed the "same duties" set forth in the job descriptions for the two positions previously sought by Plaintiff — *i.e.,* Administrator, Support Operations and Director, Support Operations.  (First Amended Complaint at ¶¶ 40-

41; *see also* Plaintiff's Dep. at 104-05.)[2]

Plaintiff testified at his deposition that he learned of Mr. Soop's promotion and additional duties at a January 19, 2015 meeting with his supervisor, Matt Legault. (*See* Plaintiff's Dep. at 98, 101-02.) In particular, Plaintiff was told that he would no longer report to Mr. Legault, and that he instead would report directly to Mr. Soop in his new role as General Manager. (*See id.* at 102, 104-05; *see also* First Amended Complaint at ¶¶ 40-41.) In addition, Defendant Kelly Smith, the division president of Oakwood Dearborn, issued a February 11, 2015 memo to the hospital's leadership team, including Plaintiff, announcing that Mr. Soop had accepted the position of General Manager and outlining his responsibilities in this position. (*See* Defendants' Motion, Ex. 18, 2/11/2015 Smith Memo.) Plaintiff testified that this position was not posted within Oakwood Dearborn, nor was he given an opportunity to apply for the position awarded to Mr. Soop. (*See* Plaintiff's Dep. at 105-06, 110-12.)

## D. Beaumont's Creation of the Position of System Director, Security

After Defendants Beaumont Health Systems and Oakwood Healthcare, along with other health care institutions, affiliated in September of 2014 to form Defendant Beaumont Health, this newly formed entity "worked to achieve efficiencies resulting from the affiliation, including modifying staffing to eliminate duplicative positions among its approximately 35,000 employees and, where possible, finding new positions for the employees displaced as a result of the reorganization." (Defendants' Motion, Ex. 19, Woolsey Decl. at ¶ 6.) As

---

[2]In fact, an Oakwood Dearborn organizational chart dated March 12, 2015 lists Mr. Soop's position as Administrator, Support Operations. (*See* Plaintiff's Response, Ex. 4, 3/12/2015 Organizational Chart.)

part of this effort, Beaumont created the position of System Director, Security, with the "responsibility for ensuring the safety and security of . . . patients, visitors, staff, physicians and property" throughout Beaumont's eight acute care hospitals and other health care facilities. (*Id.* at ¶¶ 6-8.) Plaintiff was considered for this position, along with two other individuals, Michael Geldmacher and Christopher Hengstebeck, who served as the directors of security for Botsford Hospital and Beaumont Health System prior to the formation of Beaumont Health. (*See id.* at ¶¶ 9, 17, 19.)

On January 30, 2015, each of these three candidates met with an eight-member interview panel. (*See id.* at ¶¶ 10-11.) At the conclusion of this process, Mr. Hengstebeck and Plaintiff were "identified as the preferred candidates, in that order," and Mr. Hengstebeck was awarded the position of System Director, Security. (*Id.* at ¶¶ 12-13.)[3] Plaintiff also was given a promotion, however, to the position of Deputy System Director, Security, and he received a ten percent salary increase. (*Id.* at ¶¶ 13, 15; *see also* Plaintiff's Dep. at 126-27.) Plaintiff testified that he was informed on February 17, 2015 of the decision to select Mr. Hengstebeck over him for the position of System Director, Security. (*See id.* at 128.)

**E.  Plaintiff's Filing of a Charge of Discrimination with the EEOC**

On December 23, 2015, Plaintiff filed a charge with the EEOC, alleging that Beaumont had discriminated against him on account of his race and age. (*See* Defendants' Motion, Ex. 29, EEOC Charge.) In support of this charge, Plaintiff complained that Beaumont had selected a "lesser qualified candidate" (*i.e.,* Christopher Hengstebeck) for the position of

---

[3]Defendants note that both Plaintiff and Mr. Hengstebeck were 57 years old at the time they applied for this position. (*See id.* at ¶ 14.)

System Director, Security, and that a "younger, Caucasian employee" (*i.e.,* Chris Soop) had been promoted to the position of Administrator, Support Operations without this position being posted or any opportunity for Plaintiff or others to apply. (*Id.*)

As discussed in greater detail below, Plaintiff alleges that Beaumont employees took a number of retaliatory actions against him after he filed his EEOC charge and brought this suit. At no time, however, did Plaintiff amend his EEOC charge or file a new charge to raise the claims of retaliation and hostile work environment that he has asserted in this case. Rather, upon receiving a right-to-sue letter from the EEOC on or around March 23, 2016, Plaintiff commenced the present action in this Court on June 16, 2016, alleging (i) that the three defendant Beaumont entities and two individual defendant Beaumont employees discriminated against him on account of his race and age, in violation of Title VII and the ADEA, and (ii) that Defendants also violated Title VII by retaliating against him and creating a hostile work environment in response to his filing of an EEOC charge and this suit.

## II.    STANDARD OF REVIEW

Through the present motion, Defendants seek an award of summary judgment in their favor on each of the claims asserted in Plaintiff's first amended complaint. Under the pertinent Federal Rule governing this motion, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

8

which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence "in a light most favorable to the party opposing the motion, giving that party the benefit of all reasonable inferences." *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.,* 477 F.3d 854, 861 (6th Cir. 2007). Yet, the nonmoving party may not rely on bare allegations or denials, but instead must support a claim of disputed facts by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Finally, "[a] mere scintilla of evidence is insufficient" to withstand a summary judgment motion; rather, "there must be evidence on which the jury could reasonably find for the non-moving party." *Smith Wholesale,* 477 F.3d at 861 (internal quotation marks and citation omitted).

## III.  ANALYSIS

### A.  Plaintiff's Claims Against the Individual Defendants Are Subject to Dismissal.

In counts IV and V of his first amended complaint,[4] Plaintiff alleges that individual Defendants Kelly Smith and Sherry Huffman violated Title VII by retaliating against him and creating a hostile work environment in response to his filing of an EEOC charge and this suit.  As Defendants point out in their motion, however, individual employees are not subject to liability under Title VII, even if (as here) they are considered upper-level management, because they do not fit within the statutory definition of an "employer."  *See Wathen v. General Electric Co.,* 115 F.3d 400, 404-06 (6th Cir. 1997); *Kennedy v. R.W.C., Inc.,* 359 F. Supp.2d 636, 640-41, 644 (E.D. Mich. 2005).[5]  Accordingly — and  as Plaintiff appropriately concedes in his response to Defendants' motion, (*see* Plaintiff's Response Br. at 6-7) — Plaintiff's claims against Defendants Smith and Huffman are subject to dismissal.[6]

---

[4]There is no count III in this pleading.

[5]To the extent that Plaintiff has asserted claims against Defendants Smith and Huffman under the ADEA, in addition to Title VII, the courts have held that this statute, like Title VII, does not provide for the imposition of individual liability on a plaintiff's fellow employees, be they supervisors or co-workers.  *See Smith v. Allstate Insurance Co.,* No. 05-3969, 195 F. App'x 389, 397 n.7 (6th Cir. Aug. 16, 2006); *Loffredo v. Daimler AG,* 54 F. Supp.3d 729, 735 (E.D. Mich. 2014).

[6]Although it is not clear from the first amended complaint whether Plaintiff means to pursue his claims of retaliation and hostile work environment against the defendant Beaumont entities as well as the individual defendants, Plaintiff insists in his response to Defendants' motion that he has, in fact, asserted these claims against all of the defendants, and not just Defendants Smith and Huffman.  The Court addresses the substance of these claims below.

**B. Plaintiff's Claims of Race and Age Discrimination Are Time-Barred Under the Applicable Federal Statute of Limitations.**

Turning next to the claims of race and age discrimination asserted in counts I and II of Plaintiff's first amended complaint, Defendants argue that these claims are time-barred because Plaintiff failed to timely file his EEOC charge within the applicable 300-day period of limitation after the allegedly discriminatory acts giving rise to these claims. The Court agrees.

It is well settled that before a plaintiff may pursue a Title VII or ADEA claim of discrimination in federal court, he first must exhaust the administrative remedies set forth in these statutes. *See National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 109, 122 S. Ct. 2061, 2070 (2002); *Allen v. Highlands Hospital Corp.,* 545 F.3d 387, 400 (6th Cir. 2008); *Wrobbel v. International Brotherhood of Electrical Workers, Local 17,* 638 F. Supp.2d 780, 790 (E.D. Mich. 2009). Of particular relevance here, in a so-called "deferral" state such as Michigan, the exhaustion of administrative remedies entails the timely filing of an EEOC charge within 300 days after the challenged act of discrimination occurred. *See Morgan,* 536 U.S. at 109-10, 122 S. Ct. at 2070 (citing 42 U.S.C. § 2000e-5(e)(1)); *Allen,* 545 F.3d at 401 (citing 29 U.S.C. § 626(d)); *Lewis v. Harper Hospital,* 241 F. Supp.2d 769, 771 (E.D. Mich. 2002). Thus, for each act of alleged race or age discrimination that Plaintiff wishes to challenge here, he was required to file an EEOC charge within 300 days after Defendants engaged in these allegedly discriminatory acts. Because Plaintiff filed his sole EEOC charge on December 23, 2015, the parties agree that his claims of race and age discrimination are time-barred to the extent that they are based on allegedly discriminatory acts that occurred prior to February 26, 2015. (*See* Defendants' Motion, Br.

in Support at 13; Plaintiff's Response Br. at 7.)

As Plaintiff implicitly concedes, (*see id.* at 7-8), most of his claims of race and age discrimination are barred as not timely raised in an EEOC charge within 300 days after these claims arose. First, regarding Plaintiff's complaint that he was not selected for the position of Administrator, Support Operations that was posted in July of 2013, the record is clear that Plaintiff was notified in a letter dated October 7, 2013 that the posting for this position had been cancelled. (*See* Defendants' Motion, Ex. 13, 10/7/2013 Letter.) Similarly, as for Plaintiff's claim that Defendants discriminated against him by failing to offer him a sufficient salary increase or allow him to hire a replacement Director of Security in connection with the selection of Plaintiff for the position of Director, Support Operations, the record reveals that this position was cancelled in August of 2014 after Beaumont declined to meet Plaintiff's demands for acceptance of the position. (*See* Defendants' Motion, Ex. 15.) Finally, to the extent that Plaintiff has asserted claims of race or age discrimination in Defendants' selection of Christopher Hengstebeck over him for the position of System Director, Security,[7] Plaintiff testified that he was informed of this decision on February 17, 2015. (*See* Plaintiff's Dep. at 128.) Accordingly, because each of these claims arose prior to February 26, 2015, they were not timely raised in the EEOC charge filed by Plaintiff on December 23, 2015.

This leaves only Plaintiff's claim that Defendants discriminated against him on account of his race and age when an employee of non-party Crothall, Chris Soop, was promoted

---

[7]Although Plaintiff's first amended complaint does not appear to advance any such claims, Plaintiff testified at his deposition that he believes the selection of Mr. Hengstebeck for the position of System Director, Security was motivated by unlawful considerations of race and age. (*See* Plaintiff's Dep. at 114-15.)

to a position that, in Plaintiff's view, was indistinguishable from the Administrator, Support Operations position that Plaintiff sought (and was denied) in 2013. The Court assumes, for present purposes, that Mr. Soop's 2015 promotion to a role comparable to the position of Administrator, Support Operations may be treated as a separate act of discrimination against Plaintiff, even though the decision not to offer Plaintiff this position was made back in 2013. Plaintiff contends that he timely complained of Mr. Soop's promotion in his EEOC charge, where he purportedly learned of this promotion for the first time through a March 12, 2015 e-mail and accompanying organizational chart issued by Defendant Kelly Smith. (*See* Plaintiff's Response, Ex. 4, 3/12/2015 Smith e-mail.)

As Defendants correctly observe, however, the record demonstrates as a matter of law that Plaintiff was notified of Mr. Soop's promotion by February 11, 2015 at the latest. First, Plaintiff expressly alleges in his first amended complaint that his supervisor, Matt Legault, informed him on January 19, 2015 that "he would now be reporting to Chris Soop, a 35 year old while male who was promoted by DEFENDANT SMITH to General Manager-Crothal[l] (a contract company)," and that by virtue of this promotion, Mr. Soop was assigned "the same duties previously described in" the 2013 job posting for the position of Administrator, Support Operations. (First Amended Complaint at ¶¶ 40-41.) Likewise, Plaintiff testified at his deposition that he learned of Mr. Soop's promotion — as well as the additional duties attendant to this promotion, and the fact that he would begin reporting directly to Mr. Soop — at a January 19, 2015 meeting with Mr. Legault. (*See* Plaintiff's Dep. at 98, 101-02, 104-05.) Apart from this January meeting with his supervisor, Plaintiff also acknowledged receiving a February 11, 2015 memo issued by Defendant Kelly Smith to the Oakwood Dearborn leadership team, stating that Mr. Soop had "accepted the

position of General Manager, Crothall" and would "oversee the daily operations and strategic planning within" six specified departments at Oakwood Dearborn.  (Defendants' Motion, Ex. 18, 2/11/2015 Smith Memo; *see also* Plaintiff's Dep. at 104.)  Plaintiff testified that this February 11 memo confirmed what he had already been told at his earlier meeting with Mr. Legault — namely, that Mr. Soop had been promoted to general manager, and that his duties in this position were essentially the same as those identified in the job description for the position of Administrator, Support Operations that Plaintiff had sought back in 2013. (*See id.* at 104-05; *see also* Defendants' Reply, Ex. 1, Plaintiff's notes regarding Administrator, Support Operations position (confirming Plaintiff's deposition testimony on this point).)

This record defeats Plaintiff's contention that he first learned of Mr. Soop's promotion through the e-mail and organizational chart issued by Ms. Smith on March 12, 2015, and that his December 23, 2015 EEOC charge therefore was timely filed with respect to the claims of discrimination arising from this promotion.[8]  Rather, because any discriminatory

---

[8]Indeed, while Plaintiff characterizes Ms. Smith's e-mail as "announc[ing]" Mr. Soop's promotion, (*see* Plaintiff's Response Br. at 7), Defendants correctly observe that this e-mail announces the appointment of **two other** individuals to administrative positions, and that its sole reference to Mr. Soop is as "part of an administrative team" that these other two individuals were joining, (*see* Plaintiff's Response, Ex. 4, 3/12/2015 Smith e-mail).  This plainly indicates, contrary to Plaintiff's assertion, that Mr. Soop had already been promoted at some point prior to this e-mail.

Nonetheless, at the August 16, 2017 hearing on Defendants' motion, counsel for Plaintiff insisted that Ms. Smith's e-mail qualifies as Plaintiff's initial notice of unlawful discrimination in the promotion of Mr. Soop because the organizational chart accompanying this e-mail expressly identified Mr. Soop as holding the position of "Administrator, Support Operations."  As discussed, however, Plaintiff has explicitly acknowledged, both in his complaint and at his deposition, that he was aware no later than February 11, 2015 that the duties assigned to Mr. Soop by virtue of his promotion to General Manager for Crothall were the same as those described in the 2013 posting

14

acts in connection with Mr. Soop's promotion occurred prior to February 26, 2015 — *i.e.,* outside the 300-day window preceding Plaintiff's December 23, 2015 EEOC charge — and because the record establishes that Plaintiff learned of this alleged discrimination no later than February 11, 2015, he failed to timely raise this claim of discrimination within 300 days after it arose. It follows that Plaintiff's claims of race and age discrimination in connection with Mr. Soop's promotion — like the other claims of discrimination asserted in Plaintiff's complaint — are time-barred in light of Plaintiff's failure to timely pursue his administrative remedies before bringing this suit.[9]

**C.   Plaintiff Has Failed to Establish a *Prima Facie* Case of Retaliation.**

Finally, in counts IV and V of his first amended complaint, Plaintiff alleges that Defendants unlawfully retaliated against him and created a hostile work environment in response to his filing of an EEOC charge and his commencement of this suit.[10] Defendants challenge these claims on two grounds, arguing (i) that Plaintiff failed to exhaust his administrative remedies with respect to his claims of retaliation and retaliatory harassment, and (ii) that Plaintiff has not established a *prima facie* case of retaliation. Although the first

---

for the position of Administrator, Support Operations. It follows that the mere use of this label in the organizational chart circulated by Ms. Smith added nothing to Plaintiff's understanding of the position to which Mr. Soop had been promoted.

[9]In light of this conclusion, the Court need not reach Defendants' challenges to the merits of Plaintiff's claims of race and age discrimination.

[10]As noted earlier, these claims arguably have been asserted solely against the two individual defendants, and not the defendant Beaumont entities. In his response to Defendants' motion, however, Plaintiff insists that he means to assert claims of retaliation against all of the defendants, and the Court accepts this contention for present purposes.

of these contentions is questionable,[11] the Court agrees with the second.

In the absence of direct evidence of retaliatory motive, Plaintiff's claims of retaliation and retaliatory harassment are properly analyzed under the familiar burden-shifting approach articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973).[12]  At the first step of this analytical framework, Plaintiff must establish each of the four elements of a *prima facie* case of retaliation or retaliatory harassment:  (i) that he "engaged in activity protected by Title VII;" (ii) that "this exercise of protected rights was known to" Defendants; (iii) that Defendants "thereafter took adverse employment action against [Plaintiff], or [he] was subjected to severe or pervasive retaliatory harassment by a supervisor;" and (iv) that "there was a causal connection between the protected activity and the adverse employment action or harassment." *Michael v. Caterpillar Financial Services Corp.,* 496 F.3d 584, 595 (6th Cir. 2007) (internal quotation marks and citation omitted).  Defendants concede, for present purposes, that Plaintiff engaged in protected activity by filing an EEOC charge and bringing this suit, and that they were aware of this protected activity.  They contend, however, that Plaintiff cannot establish the remaining two elements of his *prima facie* case.

---

[11]As an initial matter, Defendants raised their challenge to Plaintiff's lack of administrative exhaustion for the first time in their reply brief in support of their motion. In any event, in one of the decisions cited by Defendants in support of this challenge, the Sixth Circuit expressly recognized that an EEOC charge encompasses all claims that "can be reasonably expected to grow out of" the charge, and that "[g]enerally, retaliation claims based on conduct that occurs after the filing of the EEOC charge can be reasonably expected to grow out of the charge."  *Strouss v. Michigan Department of Corrections,* 250 F.3d 336, 342 (6th Cir. 2001).

[12]Plaintiff does not claim to have produced any such direct evidence of retaliatory motive, but instead acknowledges that his claims of retaliation should be evaluated under the *McDonnell Douglas* standard.  (*See* Plaintiff's Response Br. at 12.)

Turning first to the "adverse employment action" prong of a *prima facie* case of retaliation, Plaintiff correctly observes that in the wake of *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53, 126 S. Ct. 2405 (2006), his "burden of establishing a materially adverse employment action is less onerous in the retaliation context than in the anti-discrimination context." *Michael,* 496 F.3d at 595-96. In particular, "[a] materially adverse employment action in the retaliation context consists of any action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Michael,* 496 F.3d at 596 (quoting *Burlington Northern,* 548 U.S. at 68, 126 S. Ct. at 2415). Nonetheless, the employment action must be "*material[ly]* advers[e]," as "it is important to separate significant from trivial harms," and "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington Northern,* 548 U.S. at 68, 126 S. Ct. at 2415 (emphasis in original).

In an effort to establish this element of his *prima facie* case, Plaintiff points to a number of purportedly adverse actions taken against him by Defendants Smith and Huffman:

> (i) Ms. Smith's request that Plaintiff advise her how much of his time was devoted to functions involving the Dearborn hospital, versus other work sites, so that she could allocate a portion of his salary to the budgets of these other facilities, (*see* Plaintiff's Dep. at 165-66);

> (ii) Plaintiff's receipt of a "rather-not-so-nice" e-mail from Ms. Smith complaining that he had not informed her of a pay increase for security department employees, (*id.* at 170-71);

> (iii) the removal of Plaintiff's name from a mailing list of Oakwood Dearborn's senior leadership, (*see id.* at 172-73, 194);

> (iv) Ms. Huffman's allegedly incorrect claim that Plaintiff had failed to turn in

17

a training sheet, which led to a series of e-mails between Plaintiff and his supervisor, Chris Soop, (*see id.* at 194-95);

(v) Ms. Huffman's allegedly inappropriate counseling of Plaintiff for an incident between him and a hospital pharmacy technician, (*see id.* at 198-202); and

(vi) the allegedly wrongful termination of two security officers in Plaintiff's department without adequate investigation, which triggered additional investigation by Plaintiff that led to reversal of this decision and reinstatement of the employees, (*see id.* at 214, 217-19).

Plaintiff further complains of an "inappropriate letter of counseling" he received at some point, and of events occurring "[m]ore recently," between February and May of 2017. (Plaintiff's Response Br. at 13-15.) He fails to cite any support in the record for these latter allegations, however, and the Court "declines to search the record on Plaintiff's behalf for evidence" indicating that these alleged events occurred. *Harrison v. Oakland County,* 612 F. Supp.2d 848, 859 (E.D. Mich. 2009); *see also* Fed. R. Civ. P. 56(c)(1)(A) (emphasizing that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record").[13]

Yet, beyond merely recounting these various incidents that occurred after he filed his EEOC charge, and reciting in general terms the relevant legal standards, (*see* Plaintiff's Response Br. at 13-15), Plaintiff makes no effort to explain, much less demonstrate, how any of these incidents might qualify as a materially adverse employment action under the standards he has recited, and it is not the duty of this Court to marshal such arguments on

---

[13]In addition, Plaintiff's counsel suggested at oral argument that Defendants took adverse action against Plaintiff by not allowing him to apply for the position to which Chris Soop was promoted in early 2015. Since this took place well before Plaintiff engaged in protected activity by filing an EEOC charge in December of 2015, Defendants can hardly be accused of retaliating against protected activity that had not yet occurred.

his behalf.  In any event, the incidents cited by Plaintiff appear to be comparable to  those deemed by the courts to fall short of materially adverse actions.  *See, e.g., Burlington Northern,* 548 U.S. at 68-69, 126 S. Ct. at 2415-16 (explaining that "petty slights, minor annoyances, and simple lack of good manners" normally are not materially adverse actions, and that "[a] supervisor's refusal to invite an employee to lunch is normally trivial" unless it deprives the employee of a "significant[]" opportunity for "professional advancement"); *Taylor v. Geithner,* 703 F.3d 328, 338 (6th Cir. 2013) (finding that two written reprimands of the plaintiff employee did not "amount[] to . . . adverse employment action[s]" absent "evidence in the record that any disciplinary action resulted from" these reprimands or that they were part of "a larger pattern of intimidation"); *Wierengo v. Akal Security, Inc.,* No. 13-1890, 580 F. App'x 364, 373 (6th Cir. Sept. 10, 2014) (plaintiff's claims that she was "shunned and ostracized" by supervisors and co-workers and that thirteen co-workers filed a complaint against her did not "rise to the level of" adverse employment actions, where she did not allege these incidents "resulted in any sort of injury or harm to her professionally or personally" (internal quotation marks and citation omitted)); *Finley v. City of Trotwood,* No. 11-4277, 503 F. App'x 449, 454 (6th Cir. Nov. 1, 2012) (affirming a district court ruling that exclusion from meetings, verbal warnings, and "narrowing of responsibilities without a corresponding decrease in pay or benefits" were not materially adverse actions); *Pettit v. Steppingstone, Center for the Potentially Gifted,* No. 09-2260, 429 F. App'x 524, 533 (6th Cir. July 7, 2011) (holding that the imposition of additional timekeeping requirements was not materially adverse as it "affected neither [the plaintiff's] position nor [her] compensation" and was "the type of inconvenience that falls short of an actionable level of material adversity"); *Cecil v. Louisville Water Co.,* No. 07-6232, 301 F.

App'x 490, 501 (6th Cir. Nov. 24, 2008) (determining that the incidents cited by the plaintiff, including her exclusion from a meeting and plant tour, the uncooperativeness of fellow employees, the relocation of her desk, the increased presence of her supervisor, and a negative evaluation that did not "significantly affect[] her salary or professional advancement," did not qualify as materially adverse actions). Viewed against this body of law, the record put forward by Plaintiff here does not establish a materially adverse action or severe or pervasive harassment that could sustain a *prima facie* case of retaliation.

Nor has Plaintiff demonstrated a causal connection between his protected activity and any such materially adverse action. Once again, the sum total of Plaintiff's argument on this point is his conclusory assertion — unsupported by discussion of or citation to any case law or other authority — that because each of the above-cited incidents "occurred after Plaintiff filed his EEO complaint [or] immediately following the filing of his discrimination lawsuit," he therefore "can establish" the requisite causal connection. (Plaintiff's Response Br. at 14.) Yet, while the Sixth Circuit has recognized that temporal proximity alone may suffice to establish a causal connection "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity," additional evidence of a causal relationship is required "where some time elapses" between the employer's awareness and the adverse action. *Mickey v. Zeidler Tool & Die Co.,* 516 F.3d 516, 525 (6th Cir. 2008).

In this case, the earliest retaliatory conduct identified by Plaintiff allegedly occurred in April of 2016, roughly four months after Plaintiff filed his EEOC charge in December of 2015. (*See* First Amended Complaint at ¶¶ 86, 97.) This is not sufficiently close in time to Plaintiff's protected activity to obviate the need for additional evidence of a causal

connection between Plaintiff's EEOC filing and a materially adverse action.   Because

Plaintiff has not produced any such additional evidence beyond mere temporal proximity,

he has failed to establish the fourth and final element of a *prima facie* case of retaliation.

## IV.   CONCLUSION

For these reasons,

The Court hereby GRANTS Defendants' April 28, 2017 motion for summary judgment

(Dkt. 18).

SO ORDERED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  August 31, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of record
on August 31, 2017, by electronic and/or ordinary mail.

s/Carol J. Bethel
Case Manager